J-S04021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PHAN TRAN | : | |
| | : | |
| Appellant | : | No. 785 EDA 2024 |

Appeal from the Judgment of Sentence Entered January 22, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0000324-2023

BEFORE:   OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 30, 2025**

Appellant, Phan Tran, appeals the judgment of sentence entered January 22, 2024, by the Court of Common Pleas of Philadelphia County (trial court).  In 2022, Appellant was involved in a road-rage incident in which he shot the victim multiple times, causing serious, but non-fatal injuries.  He was charged with several offenses relating to the incident, and Appellant asserted that he acted in self-defense.  Following a jury trial, Appellant was found guilty of aggravated assault and possession of an instrument of crime (PIC).  He was sentenced to an aggregate prison term of 4.5 to 10 years.  Appellant now seeks relief on the grounds that the evidence of his guilt was insufficient because the Commonwealth failed to disprove his claim of self-defense; he also contends that the verdict is against the weight of the evidence.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

On October 31, 2022, in a residential neighborhood in Philadelphia, the sisters, Corinda White and Conniesha Cooper, were driving home at about 4:00 p.m. Cooper's five-year-old daughter was in the back seat. White stopped her vehicle at a stop sign, but did not immediately resume driving.

At that time, Appellant approached the intersection in his own vehicle, arriving from the same direction that White did. Appellant became frustrated that White's car was stopped, preventing him from making a turn. He lowered the driver's side window of his vehicle and shouted obscenities at White, urging her to drive more decisively. He then tried to navigate around White's vehicle, but in doing so, his car struck its rear bumper. Appellant continued down the street to park his car near his home; he then walked back to the location of the accident, where White's car was still parked.

Appellant approached the sisters while wearing a "fanny pack" across his chest. The fanny pack contained a loaded handgun and extra ammunition.[1] Appellant and White then had a heated argument. A bystander to the accident, Anthony Sofia, observed Appellant arguing with White from a few feet away. Sofia had lived in the neighborhood for many years, and he was familiar with both Appellant and the two sisters. When the auto accident occurred, Sofia had been sitting in his own car, which had been parked on the sidewalk nearby. Sofia had told the sisters upon seeing Appellant approach them on foot that he would make sure they were not harmed.

_____

[1] Appellant was legally carrying the weapon as a licensed gun owner.

When Appellant called the sisters "black bitches," Sofia pushed, and then "slapped" Appellant once in the face. *See* N.T. Trial. 11/14/2023, at 83. In response, Appellant drew a handgun out of his fanny pack and started shooting in the direction of Sofia, White, and Cooper. Appellant fired a total of nine shots.

White and Cooper were unharmed, but Sofia was shot seven times, sustaining gunshot wounds to his torso, trapezius, shoulder, buttocks, right side, and pelvis. Three of the gunshot wounds were to his back. He was later intubated and catharized during the treatment of wounds, which required surgery.

As Appellant was discharging his weapon, White and Cooper ran away, preventing them from seeing the shots being fired. Cooper heard Sofia ask Appellant why he shot him; she also heard Appellant respond, "I don't give a f**k. You shouldn't have hit me." *See id*., at 152-53, 156-57.

Cooper's child remained in the backseat of the car as shots were fired. At some point during the incident, Cooper turned around and told Appellant to stop firing because her daughter was in the car. Appellant responded that he didn't "give a f**k." *Id*., at 20. Cooper then drew her own concealed handgun (which she was licensed to carry) and fired once at the Appellant, without striking him. She would later explain that her intent was to force Appellant to withdraw so that she could get her child to safety. *See id*., at 68–69.

- 3 -

A few minutes after the shooting, Cooper drove her daughter to her mother's home down the block. She parked her car there and returned to the location of the shooting. Police arrived there moments later, and Cooper immediately told them that she had discharged her gun. She also gave a statement to the officers, which was recorded on their body cameras.

Prior to the arrival of the police, Appellant attempted to render aid to Sofia, asking bystanders for help in loading Sofia into his vehicle so that he could be taken to the hospital. The police arrived before Sofia was moved, and they arranged for his transportation. Appellant was arrested, and then charged with attempted murder, aggravated assault, PIC, simple assault, and recklessly endangering another person.

At trial, Cooper testified to the above facts. On cross-examination, defense counsel sought to impeach her with statements she made to police which were recorded in body camera footage. Cooper admitted to some inconsistencies between what she told the officers and what she recounted in her testimony. For example, Cooper had not told the officers that Appellant called her and her sister "black bitches." Some of her statements to police were also not clear as to whether she saw Sofia push, slap, or punch Appellant. Cooper explained that some of the details she gave to police might have been incomplete because she was experiencing a high degree of stress from her experience in the shooting. **See id**., at 48, 75.

The Commonwealth did not present the testimony of the victim, Sofia. Prior to trial, the Commonwealth informed the trial court that Sofia could not

be located despite their efforts to find him. Two detectives testified as to the steps they took to find Sofia.[2]

The defense presented the testimony of three witnesses to support Appellant's claim that the shooting was justified. The first witness, Kevin Jones, testified that he had lived in the neighborhood for many years, and that Sofia had a reputation in the area for being violent. Jones testified further that Appellant had a reputation for peacefulness. According to Jones, who was present to observe the shooting, it was Sofia who first became violent by punching Appellant and pressing him against a truck. **See** N.T. Trial, 11/15/2023, at 143-44. Jones admitted on cross-examination that he was familiar with Sofia on the day of the shooting, but that he did not know his name at that time.

The second defense witness, Dejuan Jackson, was another neighborhood resident, who testified that Sofia was the initial aggressor. He described seeing Sofia fighting with Appellant, holding him down, and punching him repeatedly in the face. **See id**., at 157. Further, Jackson described Sofia as having a reputation for being a violent person, while Appellant had a reputation for being nonviolent.

The third defense witness, Patricia Sample, testified solely as a character witness. She stated that she knew Appellant's family for 25 years, and that he had a reputation for being peaceful and truthful.

_____

[2] The trial court rejected Appellant's request to read the missing witness instruction to the jury.

Finally, Appellant testified on his own behalf. In his account, Sofia was the initial aggressor who attacked him without warning. Appellant stated that he believed his life was in danger, in part due to his knowledge of Sofia's criminal background. He was also intimidated by Sofia's larger size, as Appellant was about six inches shorter, and was outweighed by about 60 pounds. He claimed that White ran the stop sign and was responsible for the collision. However, this was contrary to what he told police, admitting to them that he was at fault. *Id.*, at 236–37.

Appellant said that after the accident, he parked his car and calmly returned to the scene, because in his mind, "this is just a car accident and dealing with two women." *Id.*, at 183. He added that he had no intention of using violence, going so far as to suggest that he was prepared not to fight back if White and Cooper assaulted him. *Id.*, at 180–86, 240.

Appellant alleged that, while he was speaking with White, he was "sucker punch[ed]" by Sofia in the jaw, leaving him "completely dazed." *Id.*, at 187. He claimed that he took a step back but that Sofia continued attacking him, pressing him against a truck that had been parked nearby. Appellant testified that while Sofia continued attacking him, he reached inside his fanny pack, drew his handgun, and opened fire.

Appellant claimed that Sofia posed a threat the entire time Appellant was discharging his weapon. Appellant denied that Sofia ever turned his back to run away. When confronted by the fact that Sofia's medical records showed he had been shot multiple times in the back, Appellant suggested that Sofia

- 6 -

turned his body and "fell into" the bullets as he collapsed to the ground. *Id*., at 232. Appellant explained that he was firing his weapon rapidly, and he "can't control [where bullets go] after they leave the gun." *Id*. at 232.

Like his character witnesses, Appellant claimed that Sofia had a reputation for being violent. He added that Sofia was "always going around flashing guns and knives," causing him to fear that Sofia was armed on the day of the shooting incident. *Id*., at 189. It was undisputed by the parties that Sofia had a criminal history, including convictions for voluntary manslaughter and aggravated assault. *See id*., at 77-78. An ex-girlfriend of Sofia informed an investigating officer that she had obtained a protection from abuse order against Sofia, but that claim could not be substantiated. *See id*., at 76-77.

Appellant's statements to an officer on the scene, and in his later interview with detectives, did not mention that Sofia had pinned him against a truck just prior to the point when he drew his gun. He also told detectives prior to trial that Sofia had punched him on the jaw, which was somewhat inconsistent with the testimony of the Commonwealth's witnesses, who said they only saw Sofia deliver a single "slap" to Appellant's face. The officers who responded to the scene were unable to observe any physical evidence that Appellant had been punched by a man of Sofia's stature, who, at the time, stood 5'11" tall, and weighed about 260 pounds; Appellant stood only 5'5" and weighed about 200 pounds. *See id*., at 192. Appellant's face showed little to no signs of redness or swelling. *See id*., at 106.

At the conclusion of the trial, the jury found Appellant guilty of aggravated assault and possession of an instrument of crime. He was sentenced to 4.5 to 10 years on the aggravated assault count; he was also sentenced to a concurrent term of 2.5 to five years on the PIC count. Appellant filed a post-sentence motion, asserting in relevant part that the evidence of his guilt was legally insufficient, and that the verdict was against the weight of the evidence. The post-sentence motion was denied. He timely appealed, and in his brief, he raises the two following issues for our consideration:

> I. Whether the evidence was insufficient to convict [Appellant] of aggravated assault and possessing an instrument of crime because the Commonwealth failed to disprove [Appellant's] claim of justification beyond reasonable doubt where the evidence showed that the complainant was the initial aggressor, had a history of violence, and was much bigger than [Appellant], the complainant inexplicably failed to appear for trial, and the eyewitnesses did not see the actual shooting itself[.]
>
> II. Did the trial court abuse its discretion in denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence[.]

Appellant's Brief, at 4 (suggested answers omitted).[3]

Appellant's first claim is that his convictions were not sustained by sufficient evidence of his guilt. According to Appellant, the Commonwealth

_____

[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. In its opinion, the trial court reasoned that the Commonwealth's evidence had disproven his theory of self-defense because it was shown that Appellant's use of deadly force was unreasonable; Appellant was the initial aggressor; and Appellant declined to retreat when given multiple opportunities to do so. *See* Trial Court 1925(a) Opinion, 5/6/2024, at 8-11.

failed to carry its burden of proving beyond a reasonable doubt that his use of lethal force was unjustified. In Appellant's account, Sofia attacked him without provocation, forcing Appellant to draw his weapon in self-defense and inflict lethal force against Sofia until he no longer posed a threat.

In reviewing a claim based upon the sufficiency of the evidence, the appellate court must construe all the record evidence in the light most favorable to the verdict winner (here, the Commonwealth), giving that party the benefit of all reasonable inferences that may be drawn from the evidence. *See Commonwealth v. Widmer*, 318, 744 A.2d 745, 751 (Pa. 2000).

A criminal defendant is guilty of aggravated assault if he "(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1). Serious bodily injury is "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

When a victim sustains serious bodily injury due to a defendant's conduct, the Commonwealth can, but does not necessarily have to, establish the defendant's specific intent to cause such harm. *See Commonwealth v. Patrick*, 933 A.2d 1043, 1046 (Pa. Super. 2007). The statute's intent requirement can be met if the defendant acted recklessly under the circumstances, manifesting an extreme indifference to human life. *See id*.

A person is guilty of PIC if he possesses any instrument of crime with intent to employ it criminally. *See* 18 Pa.C.S.A. § 907(a). "In order to convict appellant of [PIC], the Commonwealth [must] prove that [the defendant] possessed [a] gun under circumstances manifestly inappropriate for such lawful uses the gun may have had and with an intent to employ it criminally." *Commonwealth v. Jeter*, 418 A.2d 625, 628 (Pa. Super. 1980).

Generally, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence to prove the defendant's guilt beyond a reasonable doubt. *See Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009). The jury may find a defendant guilty as long as there is evidence satisfying every element of a criminal offense; "[a]ny doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Id.* (quoting *Commonwealth v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.* (quoting *Bostick*, 958 A.2d at 560).

Moreover, in applying the above test, the entire record must be evaluated, and all evidence presented at trial must be considered. *Commonwealth v. Gause*, 164 A.3d 532, 541 (Pa. Super. 2017). The finder of fact, "while passing upon the credibility of witnesses and the weight of the

evidence produced, is free to believe all, part, or none of the evidence." *Id.* (quoting *Commonwealth v. LaBenne*, 21 A.3d 1287, 1289 (Pa. Super. 2011)).

Under 18 Pa.C.S.A. § 505(a), "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." Deadly force is "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury." 18 Pa.C.S.A. § 501.

The use of deadly force is authorized where the actor reasonably believes "that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat." 18 Pa.C.S.A. § 505(b)(2). The actor also may not use deadly force if the actor "provoked the use of force against himself in the same encounter" with an intent to cause death or serious bodily injury, or if the actor can retreat with complete safety without using deadly force, but declined to do so. *Id.* Finally, the actor's belief in the necessity of lethal force must be "reasonable." *See* 18 Pa.C.S.A. § 501 (defining "belief" as a "reasonable belief").

There is no burden on a defendant to prove a claim of self-defense. *See Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001). When the issue is raised by the defendant, and the record contains some evidence to warrant a finding of self-defense, the Commonwealth has the burden of disproving the affirmative defense beyond a reasonable doubt. *See id*. The "disbelief of a

denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact." ***Id***. (quoting ***Commonwealth v. Graham***, 596 A.2d 1117, 1118 (Pa. 1991)).

The Commonwealth may disprove a claim of self-defense by introducing evidence that the defendant "did not reasonably believe deadly force was necessary; he provoked the incident, or he could retreat with safety[.]" ***Commonwealth v. Fowlin***, 710 A.2d 1130, 1134 (Pa. 1998). The fact-finder is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense. ***See Commonwealth v. Houser***, 18 A.3d 1128, 1135 (Pa. 2011).

Here, we find that the Commonwealth's evidence was sufficient to disprove Appellant's theory of self-defense and establish his guilt of aggravated assault and PIC. This was not a case where the fact-finder simply disbelieved Appellant's account. As described by the Commonwealth's witnesses, the facts showed that Appellant immediately drew a handgun and fired it at Sofia after he was pushed and slapped once in the face. Those facts, if believed, permitted the jury to find that Sofia did not threaten Appellant with a degree of violence that would justify Appellant's use of lethal force.

There was no indication that Sofia was armed, or that he intended to kill Appellant or cause him serious bodily injury. A single push and a slap from Sofia fell short of that type of threat. ***See e.g., Commonwealth v. Allen***, 276 A.2d 539, 540-41 (Pa. 1971) (defendant not entitled to fatally stab victim

with a knife where defendant had alleged that the victim had "swung" at the defendant while attempting to steal his car).

An actor who is confronted with non-deadly force, such as a push or a punch, may not retaliate excessively with lethal force, such as the use of a knife or a gun. *See Commonwealth v. Jones*, 332 A.2d 464 (Pa. Super. 1974); *see also Commonwealth v. Burns*, No. 1410 EDA 2022 (Pa. Super. filed April 11, 2023) (unpublished memorandum) (same). This is because the defendant **must be free from fault in provoking or escalating the altercation** that led to the offense, before the defendant can be excused from using deadly force." *Burns*, No. 1410 EDA 2022, at *5 (quoting *Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa. Super. 2014)) (emphasis in original).

In *Burns*, for example, we held that a defendant had no viable self-defense claim where the altercation between him and the victim "occurred with only punches being exchanged, [the defendant] grabbed a knife and stabbed his unarmed foe." *Burns*, 1410 EDA 2022, at *8. The defendant's escalation of the altercation established that he did not reasonably believe he was "in danger of death or serious bodily injury at the time of the attack, and [the defendant] responded with more force than necessary to defend himself[.]" *Id*., at *9. The same rationale applies here – Appellant brought a gun to a fist fight, and the evidence of this escalation was sufficient to show that he used excessive force as soon as a firearm was drawn.

Appellant's own statements, as recounted by Cooper and White, were also inconsistent with Appellant's claim that he used lethal force only because he thought it was reasonably necessary to protect himself. They testified that Appellant referred to them using racial epithets, and that he declared he had no regard for the safety of Cooper's nearby child. This testimony undercut Appellant's claim that he discharged his weapon solely to neutralize the threat that Sofia posed, as it suggested instead that Appellant was acting unreasonably and with a manifest extreme indifference to human life.

Even assuming that Appellant impeached the testimony of Cooper and White with evidence that they gave some conflicting statements to police at the shooting, it was for the jury to assess the credibility of the victims, as well as Appellant, who testified on his own behalf. The jury was free to believe or disbelieve any, part, or all of that evidence. Thus, since the Commonwealth presented evidence that would tend to refute Appellant's claim of self-defense, his sufficiency issue is meritless, and no relief is due on that ground.

Appellant's second and final claim is that the verdicts are against the weight of the evidence. When a motion for a new trial has been filed, the role of the trial court is to "determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or given them equal weight with all the facts is to deny justice.'" *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000)). "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and

the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id*. (quoting *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994)).

On review of a trial court's denial of a weight of the evidence claim, the appellate court must consider not "the underlying question of whether the verdict is against the weight of the evidence," but rather whether the trial court abused its discretion. *Id*. (quoting *Widmer*, 744 A.2d at 753). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id*. (quoting *Widmer*, 744 A.2d at 753)). An abuse of discretion in this context means "where the course pursued [by the trial court] represents not merely an error in judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows the action is a result of partiality, prejudice, bias or ill-will." *Id*. (quoting *Widmer*, 744 A.2d at 753).

Here, the trial court considered the evidence that was presented to the jury and determined that the verdict did not shock the conscience. The central issue for the jury to decide was whether Appellant acted in self-defense, and as discussed above, the jury was free to credit the evidence which tended to show that he intentionally and recklessly shot Sofia with unjustified lethal force, and that he employed his firearm in a criminal manner. We find no basis in the record on which to conclude that the trial court's denial of

Appellant's weight of the evidence claim constituted an abuse of discretion. *See **Commonwealth v. Cousar**,* 928 A.2d 1025, 1035-36 (Pa. 2007).  Thus, Appellant's claims have no merit, and the order on review must be upheld.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2025